## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JENNIFER A. FREY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:05-CV-1493-JOF |
| GAINEY TRANSPORTATION | : | |
| SERVICES, INC., et al., | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

This matter is before the court on Plaintiff's motion to compel [88-1] and Plaintiff's motion to strike answer of Defendant or in the alternative provide jury instruction as sanction for spoliation of evidence [91-1].

**I.     Background**

Plaintiff, Jennifer Frey, filed suit against Defendants, Emmet Rogers and Gainey Transportation Services. Frey was injured in a November 10, 2003 accident involving her car and a tractor-trailer driven by Rogers while employed by Gainey Transportation.

**A.     "Spoliation" Letter**

Ten days after the accident, Plaintiff's counsel sent a letter to Tim Kelly, the Safety Director at Gainey, demanding that Mr. Kelly preserve certain documents and materials fully

described in a fifteen-page attachment to the letter.   Plaintiff's counsel asserted that any "destruction or alteration" of the material would be considered "spoliation of evidence." Specifically, Plaintiff's counsel requested that the following material be maintained:

•       Copies of the driver's "trip reports and/or trip envelopes, daily loads delivered or picked up reports or any otherwise described work reports, work schedule reports, fuel purchased reports, or any reports made by [the driver] to [Gainey], inclusive of daily, weekly or monthly cargo transported, time and/or distance traveled reports or work records excluding only those documents known as 'driver's daily logs or driver's record of duty status'"

•       Copies of all receipts for any trip expenses or purchases made by the driver during the trip "regardless of type of purchase, such as fuel, weighing of vehicles, food, lodging, equipment maintenance, repair or equipment cleaning, special or oversize permits, bridge and/or toll roads, loading or unloading cost, and all otherwise described receipts regardless of the type of objects or services purchased"

•       Copies of "all cargo pickup or delivery documents prepared by any of the transportation brokers, involved shippers or receivers, motor carrier

2

operations/dispatch personnel, drivers, or other persons or organizations relative to the cargo transported and the operations" of Rogers

• Copies of "any and all written requests, letters, memoranda, instructions, or orders, for transportation of cargo prepared by [Gainey], transportation brokers, involved shippers or receivers, motor carriers operations/dispatch or sales personnel, drivers or other persons or organizations relative to the operations and cargo transported" by Rogers

• Copies of all "bills of lading and/or cargo manifest prepared or issued by any shippers, brokers, transporting motor carriers personnel, receivers of cargo.  This specifically includes readable and complete copies of bills of lading, manifest, or other documents regardless of form or description, that show signed receipts for cargo delivered along with any other type of document that may show dates and times of cargo pickup or delivery" relative to Rogers.

• Copies of "all equipment or cargo loading, unloading or detention of equipment records along with any other documents showing cargo pickup and/or deliver dates and times or delays and/or detention of equipment" relative to Rogers

3

- Copies of "all cargo transported freight bills, Pro's or otherwise described similar documents inclusive of all signed or unsigned cargo pickup and delivery copies that indicate date and/or time of pick up or delivery of cargo" by Rogers

- Copies of "all written instructions, orders, or advice given [to Rogers] in reference to cargo transported, routes to travel, locations to purchase fuel, cargo pickup or delivery times issued by [Gainey], shippers, receivers, or any other persons or organizations"

- Copies of "dispatch and/or operational records indicating assignment of equipment and drivers to specific cargo pickup, transportation and delivery, dates and times of pickup and delivery, movement of cargo, shippers and receivers of cargo, and any other related operational records or documents, regardless of form.   This specifically includes all dispatch and operational type computer generated documents and materials indicating the trips, cargo, movements or activities of" Rogers

- Copies of "any driver call-in records or otherwise described written records indicating any communications between" Gainey and Rogers

- Copies of "all accounting records, merchandise purchased, cargo transportation billings or invoices and subsequent payments or otherwise described records indicating

4

billings for transportation of cargo or payment for services performed" for Gainey by Rogers

- Copies of "all initial or rough driver's trip check-in or financial settlement sheets along with all final trip accounting documents, and computer generated documents or printouts showing expenses and payment(s) for service(s) or salary paid" to Rogers. "This specifically includes any summary type documents showing all payments made to" Rogers "regardless of the purpose of payment or period of time payment was made for"

- Copies of "any and all motor carrier or driver created trip fuel mileage and purchase reports or records.  This specifically includes all documents and computer generated documents, regardless of form or subject, received from any source such as the organization known as "COMCHEK," or generated for or by [Gainey] showing date, time and location of fueling or other purchased by" Rogers

- Copies of "all checks or otherwise described negotiable instruments issued to [Rogers] in payment as trip advances, loans, or for any other purpose inclusive of checks issued for employee payroll, and/or for owner/operator or trip lessors services.

Specifically copies of both the "front and back" of each check and/or comchek issued to" Rogers

- Copies of "any and all state fuel or oversize special permits and any related documents or requests issued to or by any state agency to transport cargo over their territories regardless of the form of the permit.   The receipt acknowledging payment for the permit(s) issued by any government agency is specifically requested that relate to the movements" of Rogers

- Copies of "any and all trip leases or trip lease contracts involving [Rogers] along with all related documentation issued to or created or received by any party.   Specifically this includes any trip leases negotiated between [Gainey] and any other motors carrier or their drivers inclusive of all related documentation thereto.   Basically, "related documentation" consists of any documents created or generated in reference to each trip lease(s) and in addition, driver's daily logs or record of duty status, driver's daily condition reports, motor carrier certification of drivers qualification and include other documents that relate to the billing and payment for such movement of freight, along with all other types of documentation regardless of form or description that are relative to each occurrence involving the services and activities" of Rogers

6

- Copies of "any and all other 'operational or trip related documents' created or received by [Gainey] or any other persons or organizations, regardless of form or description and not defined herein, in the possession of any of [Gainey] and relative to the operations, activities, movements, cargo and trips accomplished" by Rogers

- Copies of the "'Driver Qualification File' maintained by  [Gainey] on [Rogers] along with any other documents contained therein, in their precise state or existence on the date of the accident (November 10, 2003)"

- "Any pre-employment questionnaires or other documents secured from [Rogers] prior to employment"

- "Any and all completed applications for employment secured both before and/or after the actual date of contract or employment" of Rogers

- "All medical examinations, drug tests and certification of medical examinations includes of expired and non-expired documents relative to" Rogers

- "All of [Rogers'] annual violation statements which should include one for each twelve months of contract or employment with the Defendant motor carrier in this case."

AO 72A
(Rev.8/82)

- "All actual driver's motor carrier road tests administered to" Rogers

- "All actual driver's motor carrier written tests administered" to Rogers

- "All road and written test certificates issued by [Gainey] or any other motor carrier or organization to [Rogers] regardless of the date issued or the originator of such certificates"

- "All past employment inquiries sent to or secured from former employers along with all responses received from former employers inclusive of all U.S. mail, personal contact or telephone inquiries and results directed to or received by [Gainey] from past employers" of Rogers

- "All inquiries to and answers received from any organization in reference to the driver's license record of traffic violations and accidents directed to and/or received by [Gainey], or other organizations on behalf of [Gainey], from state or federal governmental agencies, or other organizations, relative to [Rogers'] traffic and accident record"

- Copies of "all road or written test cards, medical cards, motor carrier certification of driver qualification cards and any other motor carrier transportation related cards in

8

the possession of [Gainey] regardless of card issuance date or origin.  This specifically includes cards, as previously described herein, issued by other motor carriers to [Rogers] presently in their personal possession"

- "All annual reviews, file reviews or file summaries and related documents found in the driver qualification file of" Rogers

- "All documents relative to any drug testing of" Rogers

- "Any and all other contents of [Rogers'] driver qualification file, regardless of subject, form purpose, originator, receiver, title or description"

- Copies of "any and all other documents added to [Rogers'] 'Driver Qualification File' from November 10, 2003, to the present date, as presently maintained by [Gainey]. Please identify and produce such documents separate and apart from the documents requested" above

- Copies of "the 'Driver Personnel File', and/or any otherwise titled files on [Rogers] or in reference to [Rogers] from initial contract or employment with [Gainey] to the present date"

9

- "Applications for employment, owner/operator or other types of contracts, agreements, payroll or money advanced records, attendance records, computer generated documents and any other summary type document regardless of subject, description or form relative to [Rogers] or the services performed by [Rogers]"

- "Hiring, suspension, termination, warning notices, complaints, letters, memorandums and any other similar type documents relative to [Rogers]"

- "Prior industrial, vehicular, cargo, hazardous materials incidents, health or accident reports, or other types of injury, sickness, accidents or loss reports or records inclusive of cargo shortage or damage reports, along with all related documents to each such sickness, incident or accident that relate to" Rogers

- "FOMCSFO or other law enforcement agencies, terminal audits or roadside equipment and/or driver inspections reports, traffic citations or traffic warnings, inclusive of any of the [Rogers'] file reviews or summarys of violations of company, state or federal laws, rules or regulations committed by" Rogers

10

- "Any and all other documents found in such a file, regardless of description, title, form, origin or subject, maintained by [Gainey] in reference to [Rogers] excluding only those documents required by the FMCSR Part 391, Driver Qualifications"

- Copies of "any state or FMCSA, issued terminal audits, road equipment and/or driver compliance inspections or warnings and traffic citations issued in reference to the activities of [Rogers], or driver trainers, by any city, county, state or federal agency or law enforcement official in the possession of [Gainey].   This request specifically includes any documents issued by any governmental agencies or officials in reference to violations of any State or Federal Motor Carrier Safety or Hazardous Materials Regulations that may have been issued in reference to the activities of [Rogers] or driver trainers from January 1, 1999 to the present date"

- Copies of "all objects, photographs, drawings, reports, statements or otherwise described documents or objects in the possession of [Gainey] in reference to the accident as defined herein 'excluding only' those written documents, materials and objects that can be clearly identified as the work product of the defendant's attorneys. This specifically includes any and all reports and written or electronically recorded statements made by [Gainey] to any other person, organization or governmental entity"

11

• Copies of "any and all other accident or incident files and records maintained by [Gainey] in reference to any other vehicular accident, or incident, prior to the occurrence of the accident in question, where [Rogers] or his co-driver(s), or driver trainer, was the driver of a vehicle involved in the prior accidents or incidents"

• Copies of "all driver's record of duty status or driver's daily logs and 70/60 hour - 8/7 day summaries or otherwise described work time records created by [Rogers] for the period from September 1, 2003 through November 10, 2003 in accordance with FMCSR Part 395

• Copies of "any and all [Gainey] officers, executives or administrator's notices, directives, bulletins, publications and manuals of any type or otherwise described written instructions in reference to the day-to-day motor carrier operating and safety procedures to be followed by their company personnel, managers, supervisors, dispatchers and drivers.  Specifically, any document relative to disciplinary policies or procedures for late freight delivery, motor fleet safety or failure to comply with the FMCSR in existence and effective at [Gainey] on November 10, 2003"

• Copies of "any and all created electronic or satellite 'vehicular movement recording documents or records' such as QualComm, HighwayMaster, American Mobile

12

Satellite Corp. or any similar organization's records along with any Tractor trip recorder computer generated documents (ECM), tachograph charts, computer generated trip printouts (ECM) or any otherwise described documents generated by whatever means, in reference to the physical movement and/or geographical locations at a certain date and time of the Tractor and/or Trailer involved in the accident from September 1, 2003 to November 10, 2003"

- Copies of "any and all documents given to any expert(s) retained by [Gainey] for their review or used in formulating their opinions on this accident"

Plaintiff's spoliation motion addresses Gainey's failure to preserve any "QualComm" information. As more fully described below, QualComm is one of several companies which provide satellite tracking systems to trucking companies. Mr. Kelly could not specifically recall receiving the November 20, 2003 letter from Plaintiff's counsel. *See* Kelly Depo., Aug. 23, 2005, at 38. However, the letter was signed for by Linda Fair, Mr. Gainey's executive secretary. *Id.* at 39. Mr. Kelly did not take any action at that time to preserve the material requested by Plaintiff's counsel, but rather turned the letter over to Gainey's insurance company. *Id.* at 40. Gainey has its own insurance company called Gainey Insurance. *Id.* Mr. Libertore, the head of the insurance group, would then request whatever information he wanted from individuals in Gainey's safety department. *Id.* at 41. Mr. Kelly does not

13

specifically recall passing this letter to Mr. Libertore, and he does not recall Mr. Libertore requesting any information from the safety department.  *Id.*

In a later deposition, Mr. Kelly stated that he did not believe the incident was serious because he had been told that Plaintiff "got out of her vehicle and came back and started yelling at our driver."  *See* Kelly Depo., March 17, 2006, at 64.  He was aware that she ended up having a neck brace placed on her at the accident scene and was taken away in an ambulance. *Id.*  Because Mr. Kelly did not believe the accident to be serious, he did not save the QualComm data.  *Id.*; *see also* at 66 ("I didn't think that the nature of the accident was a serious enough accident to do that.").

### B.   QualComm System

Mr. Kelly testified that Gainey utilized the QualComm satellite tracking system which is a "communication device so the driver and the dispatchers or anybody else can communicate with the driver."  Kelly Depo., Aug. 23, 2005, at 25.  The system can also "find out where the driver within reason is at any given time if it's updating correctly."  *Id.* at 26. If the truck is operating in a metropolitan area, the system will update more frequently than in a less populated area.  *Id.*  In metropolitan areas, it should get an update every minute or two minutes.  *Id.*  The QualComm system cannot track a driver's speed at the time it "pings" the truck.  Kelly Depo., March 17, 2006, at 76.  The system can also provide vehicle position history, history of message communication between the driver and dispatcher.  *Id.* at 77-80. QualComm communication is maintained on the system for the past 90 days.  *Id.* at 81.

14

Mr. Kelly also testified that the company employs an "electronic control module (ECM)" system which can give the "history of the idle time on the truck, the fuel mileage. May give a hard brake occurrence. An average speed." Kelly Depo., Aug. 23, 2005, at 29-30.

### C.        Contentions

Plaintiff argues that the court should sanction Defendant in the form of striking its answer or issuing a jury instruction concerning the spoliation of evidence. Plaintiff contends that the QualComm data would be an objective means to test the statements of Defendant's driver to challenge whether the driver had falsified his log and was driving over hours or exceeding the speed limit at the time of the incident.

Defendant responds the court should not apply a spoliation sanction because there is no evidence that Gainey acted in bad faith. Defendant further contends that Plaintiff has not suffered any prejudice from the failure to preserve the QualComm documentation because Plaintiff has available other means of providing evidence concerning whether Rogers had falsified his log at the time of the accident.

## II.      Discussion

### A.        Spoliation

In *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005), the plaintiff sued the defendant for personal injuries he allegedly suffered as a result of a manufacturing defect in his car's airbag system. The plaintiff's counsel sent a letter to the defendant informing the company of the accident and the airbag's alleged failure to deploy. The company responded

15

that it wanted to know the location of the vehicle so that it could be inspected.  The plaintiff's counsel never responded to the company's request, and the car eventually was sold for salvage before the defendant had an opportunity to inspect it.  The defendant moved to dismiss the plaintiff's case due to spoliation of the evidence.  The district court applied the state law balancing test for spoliation of evidence found in *Bridgestone/Firestone North American Tire, LLC v. Campbell*, 258 Ga. App. 767, 768 (2003), and ultimately left it to the jury to decide whether the plaintiff or the defendant was responsible for the spoliation of evidence. *Id.* at 942-43.  The jury eventually awarded the plaintiff $250,000 in damages.

On appeal, the court first held that "federal law governs the imposition of spoliation sanctions . . . because spoliation sanctions constitute an evidentiary matter." *Id.* at 944.  But the court also noted that its opinion is "informed" by Georgia law because federal law in the Eleventh Circuit did not set forth specific guidelines on spoliation. *Id.*  The court also found that Georgia state law on spoliation was consistent with federal law.

The court then articulated that "sanctions for discovery abuses are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process.  Dismissal represents the most severe sanction available to a federal court, and therefore should only be exercised where there is a showing of bad faith and where lesser sanctions will not suffice." *Id.* (quotations and citations omitted).  The court, however, determined that only dismissal would suffice in this case because the plaintiff knew the location of the vehicle for a long period of time after the accident.  The plaintiff was also aware that the defendant wanted to

16

examine the vehicle, but ignored that request and allowed the vehicle to be sold for salvage. *Id.* Furthermore, the court found that "[e]ven absent defendant's unambiguous request for its location, plaintiff should have known that the vehicle, which was the very subject of his lawsuit, needed to be preserved and examined as evidence central to his case. Plaintiff's failure to preserve the vehicle resulted in extreme prejudice to the defendant, and failure to respond to defendant's letter displayed a clear dereliction of duty." *Id.*

The court then went on to consider the district court's application of Georgia spoliation law. To determine whether spoliation has occurred, a Georgia court addresses five factors: (1) prejudice to the non-spoliating party as a result of the destruction of evidence, (2) whether the prejudice is curable, (3) the practical importance of the evidence, (4) whether the spoliator acted in good or bad faith, and (5) potential for abuse of expert testimony about evidence was not excluded. *Bridgestone/Firestone North American Tire, LLC v. Campbell*, 258 Ga. App. 767, 768 (2003). As sanction for spoliation of evidence, a court may (1) dismiss the case, (2) exclude expert testimony, or (3) issue a jury instruction on spoliation of evidence which raises a presumption against the spoliator. *See*, *e.g.*, *Chapman v. Auto Owners Ins. Co.*, 220 Ga. App. 539, 540 (1996). The *Flury* court disagreed with the trial court's failure to impose any strong sanction because the defendant lost (1) the best evidence of the vehicle's impact speed, (2) the ability to analyze the airbag control module to determine whether it malfunctioned, and (3) the opportunity to determine whether the airbag remained in the same condition as when sold. "[D]irect examination of the vehicle's condition was

17

critically important to this case." *Id.* at 946.  The court also stated that "Georgia law does not

require a showing of malice in order to find bad faith." *Id.*  Rather, the court "should weigh

the degree of the spoliator's culpability against the prejudice to the opposing party. *Id.* [1]

> In sum, the court found:
>
> we believe the extraordinary nature of plaintiff's actions coupled with extreme
> prejudice to the defendant warrants dismissal.  Plaintiff failed to preserve an
> allegedly defective vehicle in a crashworthiness case.  The vehicle was, in
> effect, the most crucial and reliable evidence to the parties at the time plaintiff
> secured representation and notified defendant of the accident.  By the time
> plaintiff filed suit . . . plaintiff had allowed the vehicle to be sold for salvage
> despite a request from defendant for the vehicle's location.  For these reasons,
> we believe the resulting prejudice to the defendant incurable, and dismissal
> necessary.

*Id.* at 943.

Based on the instruction in *Flury*, the court will apply Georgia's five factored analysis.

The court finds that the prejudice to Plaintiff here is not as severe as it was to the defendant

in *Flury*.  Unlike a situation where an airplane engine fails and parties will employ experts to

analyze the actual engine to determine what caused the failure, here, the satellite tracking data

is only part of the puzzle concerning Plaintiff's negligence cause of action.  The QualComm

---

[1]Defendant cites to a series of cases which discuss whether an "adverse inference"
should be drawn from a party's failure to preserve evidence.  *See*, *e.g.*, *Bashir v. Amtrak*, 119
F.3d 929 (11th Cir. 1997).  Such an adverse inference is only drawn where the "absence of the
evidence is predicated on bad faith."  *Id.* at 931.  Here, however, *Flury* sets forth the analysis
of spoliation under Georgia law and specifically holds that under those circumstances, a
showing of malice is not required to establish bad faith.  Thus, the court proceeds to analyze
this case under the structure of *Flury*.

text messages were produced in discovery, as were Rogers' driver qualification file, all of his driver's logs, and all trip and operational documents related to the movement of cargo. The logs of Gainey's drivers are audited by an independent company. It is true, however, that the auditing company does not use satellite data in auditing the logs. But Rogers has testified as to his locations around the day in question. He has been cross-examined on whether he drove in excess of ten hours on that day.

Plaintiff has also contended that speed might have been a factor in the accident. It appears to be undisputed that the satellite communications, themselves, would not be able definitively to demonstrate the speed at which Rogers' truck was traveling at the time of the accident. Further, Plaintiff and Rogers would be able to testify as to their belief as to the speed.

In the end, however, Plaintiff essentially has admitted that the QualComm satellite tracking data is not crucial for her claims. Plaintiff states, "even though the Defendant truck driver has admitted to falsifying his logs, the Plaintiff is hampered in her ability to prove the extent of his unsafe driving, and the unsafe practices of Gainey's other truck drivers. This is relevant to negligent supervision and punitive damages." Motion, at 7; *see also* Reply, at 13 ("Plaintiff has been severely disadvantaged in her efforts to show the degree to which Rogers was in violation, and the liability of Gainey for punitive damages, having lost a measure of the degree of severity of Gainey's conduct, and having lost the ability to ask questions regarding the destroyed evidence."). The court disagrees. Plaintiff has already secured testimony from

the driver as to his activities on November 9-10.  There is nothing more to be gained from the "extent of his unsafe driving."  Further, the court finds that the QualComm data on Rogers' truck on November 9-10 is irrelevant as to the allegedly unsafe practices of Gainey's other truck drivers and therefore would not advance Plaintiff's negligent supervision and punitive damages claims.  Of further significance is the fact that neither party intends to proffer expert evidence.  Therefore, the court need not consider whether one party's expert will be better positioned with respect to the unavailability of this evidence.  Thus, the court concludes that Plaintiff is not irretrievably prejudiced by the lack of the QualComm satellite tracking data.

The parties expend a great deal of energy in arguing about whether Gainey acted in "good or bad faith" with respect to the preservation of the records.  As the court discussed above, however, *Flury* seems to rest on where the culpability lies and not whether the spoliating party was acting in good or bad faith.  Here, Mr. Kelly did not believe the accident to be serious and therefore did not retain the records.  Ninety days after the accident, the QualComm data was automatically deleted from the system.  Mr. Kelly did not direct that information to be deleted immediately upon learning of the accident.  At the time the records were deleted in the normal course of business, no lawsuit had been filed.  Therefore, the court cannot determine that Mr. Kelly acted in bad faith.  However, at the very least, Mr. Kelly does have culpability because he made his own assessment that the accident was not serious enough to warrant preservation of the QualComm data.

AO 72A
(Rev.8/82)

In trying to balance that culpability against the low level of prejudice suffered by Plaintiff, there are several ways in which to consider the incident in question here.  On the one hand, the fact that Plaintiff had hired a lawyer only ten days after the accident and that lawyer sent a fifteen-page letter to Gainey should have indicated to Mr. Kelly that litigation was certainly a possibility.  That Mr. Kelly had been told Plaintiff had exited her car and appeared to be uninjured did not necessarily preclude litigation.  The prudent course of action by Mr. Kelly would have been to preserve the information requested.  On the other hand, Plaintiff's counsel served the equivalent of interrogatories and requests for production on Gainey ten days after the accident before any lawsuit had been initiated.  In fact, if the court were to count the requests in Plaintiff's fifteen-page letter, it would likely exceed the number permitted under the federal rules.  Such an extensive request for materials certainly would lend itself to an effort on any plaintiff's part to sandbag a defendant in the event that any of those materials were not preserved.  The legal system does not permit discovery to begin in a lawsuit until after a party has been served with a complaint and answered, so it is difficult to allow a potential plaintiff to make an end run around the Federal Rules of Civil Procedure by filing a preemptive "spoliation" letter.  In the end, however, the court is not forced to choose between these alternatives because it finds that Plaintiff has secured other evidence that will enable her to argue that Rogers was negligent in causing the accident and further that the satellite tracking information is not relevant to her negligent supervision or punitive damages claim against Gainey.  Therefore, the court DENIES Plaintiff's motion to strike answer of

21

Defendant or in the alternative provide jury instruction as sanction for spoliation of evidence [91-1].

**B.      Motion to Compel**

The court has reviewed Plaintiff's motion to compel and Defendant's response thereto and finds that it would be useful to have a hearing on the matter.   Therefore, the parties are DIRECTED to appear in Chambers, 1921 U.S. Courthouse on **Thursday, October 12, 2006, at 10:30 a.m.**, for a hearing on Plaintiff's motion to compel [88-1].

**III.     Conclusion**

The court DENIES Plaintiff's motion to strike answer of Defendant or in the alternative provide jury instruction as sanction for spoliation of evidence [91-1].

**IT IS SO ORDERED** this 22nd day of August 2006.

        s/ J. Owen Forrester
        J. OWEN FORRESTER
    SENIOR UNITED STATES DISTRICT JUDGE

22